FILED
2015 Apr-24  AM 11:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **BILLY RAY IRVIN,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | **Case No.: 4:14-cv-459-KOB** |
| ] | |
| **GADSDEN STATE** ] | |
| **COMMUNITY COLLEGE,** ] | |
| ] | |
| **Defendant.** ] | |

## MEMORANDUM OPINION

This matter comes before the court on defendant Gadsden State Community College's "Motion for Summary Judgment," (Doc. 17), and plaintiff Bill Ray Irvin's "Motion to Strike Material Presented in Defendant's Motion for Summary Judgment," (Doc. 25).

Irvin, a maintenance employee at Gadsden State, applied for a supervisor position in Gadsden State's maintenance department. Gadsden State awarded the position to another maintenance employee, Cory Carter. Irvin alleges that Gadsden State did not award him the position because he is disabled and in retaliation for asking for reasonable accommodations of his job responsibilities under the Americans with Disabilities Act.

The court finds that Gadsden State had legitimate, non-discriminatory, non-pretextual reasons for promoting Carter instead of Irvin and, thus, will grant Gadsden State's motion for summary judgment.

I.      **Motion for Summary Judgment**

A.      **Facts**

The facts below, for purposes of summary judgment, are taken in the light most favorable to Plaintiff Bill Ray Irvin. These facts may not be the true facts proved at trial.

1.      **Before April 16, 2012**

Irvin injured his feet while in the Army when a tank grill door fell on and crushed Irvin's feet. Irvin eventually required surgery on his feet. Irvin also has gout and back problems and has used a cane on an as-needed basis for more than 20 years. Additionally, Irvin has panic attacks.

Irvin earned two associate's degrees from Harry M. Ayers State Technical College, a two-year community college, in 1993 and 2004 respectively. Irvin also holds an ESCO universal refrigeration certificate.

Irvin began working at Ayers Technical in 1993 in the maintenance department. Ayers Technical eventually promoted Irvin to supervisor in the maintenance department. In 2000 or 2001, Irvin moved from the maintenance department to the bus repair shop at Ayers Technical. In July 2003, Ayers Technical merged with Defendant Gadsden State Community College, another two-year community college. Irvin moved to Gadsden State with other Ayers Technical staff.

Stewart Davis, Gadsden State's Director of Maintenance and Grounds until 2012, supervised Irvin from 2005 through 2011. Davis reports to Dr. Jim Prucnal. Dr. Prucnal has served as the Dean of Financial and Administrative Services at Gadsden State since the late 1990s. Dr. Prucnal reports to the president of Gadsden State. Dr. Raymond Staats served as president of Gadsden State in 2012.

On September 1, 2005, Gadsden State re-assigned Irvin to work in the maintenance

department as the sole maintenance technician at Gadsden State's Valley Street campus. On October 24, 2005, Irvin sent a letter to Dr. Prucnal, which discussed Irvin's panic attacks. Dr. Prucnal had known of Irvin's panic attacks since 2005. Davis has also been aware of Irvin's foot problems, back problems, and panic attacks since he met Irvin in 2005. (Doc. 19-10, 20).

Irvin has received a salary increase and favorable employment evaluations from his supervisors every year since 2005.

### 2.      April 16, 2012

On April 16, 2012, Irvin came to work using a cane because of his disability. Davis saw Irvin and called him into his office. Davis, at Dr. Prucnal's direction, told Irvin "you know we don't have light duty and you need to go on home." (Doc. 19-10, 21-22). Davis and Dr. Prucnal thought a maintenance department policy existed that an employee had to be at full strength to work. Irvin objected because he had never seen the policy. Davis and Irvin called Kimberly Cobb, Director of Human Resources at Gadsden State. Cobb told Davis that Gadsden State did not have a policy requiring its employees to be at full strength to work. Davis acknowledged his mistake and asked Irvin to return to work. However, Irvin "took the rest of the day off anyway because [he] wanted to check his [ADA] packet." (Doc. 19-12, 6).

Later that day, Irvin visited Cobb and reviewed his personnel file. "And there was nothing in there [from Ayers Technical] about any of [his] disabilities or anything." (Doc. 19-12, 6). Irvin then went to the Ayers campus to see if Ayers Technical transferred his personnel file when the two colleges merged in 2005. Irvin spoke with the records keeper at the Ayers campus, who confirmed that Ayers Technical transferred Irvin's file to Cobb when the two colleges merged.

### 3.      Request for Accommodation

Irvin then asked Cobb what he should do about his missing disability paperwork. Cobb told Irvin to file a Request for Accommodation with Gadsden State, which Irvin did on May 2, 2012. Irvin described his disability as "Panic characterized by shortness of breath, [increased] anxiety, [increased] pulse, sense of impending doom, and withdrawal." (Doc. 19-14, 24). On May 3, 2012, Irvin filed another Request for Accommodation with Gadsden State. Irvin described his additional disability as "Multiple torn disks in lower back causing pain in lower back, legs, and feet." (Doc. 19-15, 1). Irvin requested several accommodations.

Gadsden State formed a committee to reviewed the requests. Dr. Prucnal and Davis considered the process of determining what accommodations to offer Irvin an "investigation." On June 27, 2012, Cobb; Danny Wilborn, the ADA Coordinator; and Michele Bradford, the Title IX Coordinator and Director of Legal Affairs, evaluated Irvin's requests. On July 9, 2012, Cobb spoke with Davis regarding Irvin's accommodations.

On July 12, 2012, Cobb discussed the accommodations with Irvin. Gadsden State agreed to all of Irvin's requests including the following accommodations: (1) Irvin did not have to work above ground level outside until Gadsden State purchased a new 40-foot lift; (2) Irvin could use a walking cane as needed; (3) Gadsden State purchased movable steps for Irvin to work above ground level inside; and (4) Irvin could take sick leave when experiencing symptoms of panic disorder. On July 16, 2012, Cobb memorialized the accommodations in a letter and Dr. Prucnal and Davis received a copy of the letter.

### 4.      Supervisor - Facility Maintenance I Position

In June, 2012, Dr. Staats asked the Chancellor of the Alabama Department of

4

Postsecondary Education to approve two reorganizations within the Gadsden State maintenance department. First, Gadsden State asked to combine Davis's position, Director of Facility Maintenance, with the duties of the Director of Safety and Security and to rename the position Director of Physical Plant. Second, Gadsden State asked to reassign the duties of coordinating daily building maintenance and custodial services to an existing maintenance technician position and to rename the position Supervisor - Facility Maintenance I. Gadsden State classified the Supervisor - Facility Maintenance I position as a Salary Schedule E position. On July 19, 2012, Gadsden State received approval to implement the reorganization.

On August 6, 2012, Gadsden State advertised the Supervisor - Facility Maintenance I position and left the position posted internally for 14 days. On August 20, 2012, Gadsden State stopped accepting application packets. Only Irvin and Cory Carter, another maintenance technician, applied for the Supervisor - Facility Maintenance I position. Carter is not disabled. Cobb certified that both Irvin and Carter met the minimum requirements for the position. Cobb then set up interviews for Irvin and Carter with Davis and Dr. Prucnal.

On August 21, 2012, Dr. Prucnal and Davis each interviewed Irvin and Carter separately for 15 minutes each. Irvin interviewed with Dr. Prucnal at 9:00 a.m. and with Davis at 9:15 a.m; Carter interviewed with Dr. Prucnal at 9:15 a.m. and with Davis at 9:30 a.m. Dr. Prucnal told Irvin to keep his responses brief and Irvin felt that Dr. Prucnal did not give him an opportunity to discuss his accomplishments because of the brevity of the interview. Irvin saw Carter and Davis talking in a conference room at 9:15 a.m. after he finished his interview with Dr. Prucnal. Dr. Prucnal and Davis asked each candidate the same interview questions and both took detailed notes. However, regarding one question Davis found Irvin answered incorrectly and Carter

5

answered correctly; Davis told Irvin "[w]ell me and Cory [Carter], the guy we used to work for

. . . used to ask people that [question] all the time. . . . Me and Cory [Carter] were the only two, I

think, that had worked for that particular guy." (Doc. 19-12, 17).

Dr. Prucnal found that Carter performed better during the interview. Dr. Prucnal thought

"[Carter] had better qualifications" such as his HVAC contractor's license and work as a

journeyman sheet metal worker. (Doc. 19-16, 29). Dr. Prucnal found these qualifications

important because "it tells me that [Carter is] able to complete a series of or parts of education

and then take exams and then do the work of a contractor, which involves a lot of diagnostics, a

lot of installations, a lot of design, recommendations, all of which he would face on the job. . . . I

consider that very valuable." (Doc. 19-16, 30-31). Dr. Prucnal also thought "[Carter had] better

communication skills" because Carter "described projects in-depth. He described work

experiences, what he had accomplished in-depth. He discussed team leadership." (Doc. 19-16,

29). In contrast, Irvin gave short, often one word answers. Finally, Dr. Prucnal thought "[Carter

had] a wide range of experience." (Doc. 19-16, 29).

Davis also thought Carter the better candidate. Davis considered Carter a good manager

because Carter had served as an informal point of contact in Davis's absence from the

maintenance department for several years. Davis also considered favorably that Carter had

overseen major projects for Gadsden State including the installation of a boiler system that

"saved probably six hundred thousand dollars." (Doc. 19-10, 13). Further, Davis thought that

Irvin answered two technical interview questions incorrectly that Carter answered correctly.

Davis also believed Carter had a better rapport with the other maintenance technicians.

Dr. Prucnal and Davis discussed their separate interviews of Irvin and Carter immediately

after the interviews and agreed to recommend Carter to Dr. Staats for the Supervisor - Facility Maintenance I position. Dr. Staats stated in a July 16, 2012 email that he planned to interview the applicants for the position, but ultimately he did not interview anyone. Instead, on August 23, Dr. Staats chose Carter for the Supervisor - Facility Maintenance I position and Cobb notified Carter and Irvin.

### 5.    Hiring Polices

Gadsden State has polices against unlawful employment practices including ADA discrimination.

The *Uniform Guidelines For Compliance and Monitoring of Recruitment and Selection of ACCS Institutions* governs hiring by Gadsden State. The *Uniform Guidelines* contain "a uniform procedure for the selection of faculty, administrative, and supervisory personnel on State Salary Schedules B, C, and D." (Doc. 19-16, 54). "The Chancellor [of the Alabama community college system] also requires *similar* process to fill positions on Salary Schedule E." (Doc. 19-16, 54 (emphasis added). The Uniform guidelines generally require Gadsden State to form a search committee to rank candidates for Schedule B, C, and D positions. Gadsden State's president is required to interview the top three candidates from the search committee and choose the best candidate for each Schedule B, C, and D position.

Generally, a search committee is also used by Gadsden State for Schedule E positions. Supervisors generally interview candidates for Schedule E positions and submit a recommendation to the president. The president generally does not interview for Schedule E positions.

### 6.   Litigation

On August 31, 2012, Irvin filed a grievance with Gadsden State. On October 18, 2012, Irvin filed a Charge of Discrimination with the Equal Employment Opportunity Commission. In its response to Irvin's EEOC charge, Gadsden State said it selected Carter instead of Irvin because "[b]ased on personal observation in the work environment, Mr. Carter was deemed to have better leadership abilities, and communication and organization skills." (Doc. 19-7, 5). On March 14, 2014, Irvin filed his complaint. (Doc. 1). On January 20, 2015, Gadsden State moved for summary judgment. (Doc. 17).

### B.   Standard of Review

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.* at 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that

there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial*.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254. The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *Id.* at 255.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274,1282 (11th Cir. 1999). The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*,

9

477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.

### C.    Analysis

Irvin sued Gadsden State under the ADA and the Rehabilitation Act.[1] Irvin claims that Gadsden State discriminated against him because of his disability by failing to promote Irvin to the Supervisor - Facility Maintenance I position. Further, Irvin claims that Gadsden State retaliated against him for requesting an accommodation under the ADA by failing to promote him.

Retaliation and disability discrimination claims are analyzed under the *McDonnell Douglas* burden shifting framework. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)*; accord Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must first establish a *prima facie* case of retaliation or disability discrimination. *See Cleveland*, 369 F.3d at 1193. The defendant may then rebut the *prima facie* case by showing legitimate, non-discriminatory reasons for the adverse employment action. *Id*. Finally, the plaintiff must show that the defendant's reasons are pretext. *Id.*

Irvin's *prima facie* case of retaliation is discussed first. Irvin's *prima facie* case of disability discrimination is discussed second. Gadsden State's legitimate, non-discriminatory reasons for choosing Carter are discussed third. Irvin's pretext arguments are discussed fourth.

---

[1] "Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000); *See* 29 U.S.C. § 794(d). All discussion of Irvin's ADA claim also applies to his Rehabilitation Act claim.

1.      **Retaliation *Prima Facie* Case**

"[T]o prove [a *prima facie* case for] an ADA retaliation claim, a plaintiff must show that: (1) he engaged in conduct protected by the ADA; (2) he was subjected to an adverse employment action at the time, or after the protected conduct took place; and (3) the defendant took an adverse employment action against [him] because of [his] protected conduct." *Collado*, 419 F.3d at 1158 (internal quotation marks omitted). Gadsden State argues that Irvin fails to establish the third element because Irvin's statutorily protected conduct and adverse employment action occurred too far apart in time.

"A plaintiff may prove causation by showing a close temporal proximity between the statutorily-protected activity and the adverse employment action." *Bailey v. City of Huntsville*, 517 Fed. App'x 857, 861 (11th Cir. 2013). "However, mere temporal proximity, without more, must be very close to establish causation." *Id.* (internal quotation marks omitted). Generally, "a three-to-four month disparity is not considered sufficiently close under our precedent." *Id.* Conversely, a seven-week gap is not too long for close temporal proximity causation in an ADA case. *See Farley v. Nationwide Mutl. Ins. Co.*, 197 F. 3d 1322, 1337 (11th Cir. 1999); *see Curtis v. Broward Cnty.*, 292 Fed. App'x 882, 885 (11th Cir. 2008) (same).

The period of time for close temporal proximity causation is measured from the first date an employer is aware of the statutorily protected conduct. *See Adams v. City of Montgomery*, 569 Fed. App'x 769, 773 (11th Cir. 2014) (date employer became aware of employees' filing of EEOC charge begins period of time for close temporal proximity causation analysis); *see Farley*, 197 F. 3d at 1337 (same); *see Jiles v. United Parcel Serv., Inc.*, 360 F. App'x 61, 66 (11th Cir. 2010) (filing of race discrimination grievance with employer begins period of time for close

11

temporal proximity causation analysis and intervening "series of events" irrelevant); *see Thomas v. Cooper Lighting, Inc.*, 506 F. 3d 1361, 1361 (11th Cir. 2007) (presenting written complaint of sexual harassment to HR begins period of time for close temporal proximity causation analysis); *see Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (attorney sending formal complaint letter to state agency begins period of time for close temporal proximity causation analysis); *see Lowe v. Cardinal Health, Inc.*, --- F. Supp. 3d ---, 2014 WL 5148455, at *8 (N.D. Ala. Oct. 14, 2014) (reporting supervisor's misconduct to employer begins period of time for close temporal proximity causation analysis).

However, "temporal proximity alone is insufficient to create a genuine issue of fact as to a causal connection when there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecomm., Inc.*, 231 F. 3d 791, 799 (11th Cir. 2000); *see Higdon*, 393 F. 3d at 1220 (applying rule to ADA context). Knowledge of the protected expression cannot be "imputed" to the decision maker based on the knowledge of colleagues, but can be based on circumstantial evidence. *See Brungart*, 231 F. 3d at 799-800.

Here, Davis and Dr. Prucnal have known about Irvin's disability since 2005 when Irvin moved to Gadsden State from Ayers Technical. Davis and Dr. Prucnal mistakenly tried to send Irvin home because of his disability on April 16, 2012. Later that day, Irvin and Cobb discussed how Irvin could file a Request for Accommodation and Irvin filed requests with Gadsden State on May 2, 2012 and May 3, 2012. On July 9, 2012, Cobb spoke to Davis about Irvin's Requests for Accommodations and on July 16, 2012, Davis and Dr. Prucnal received a letter from Cobb outlining Irvin's accommodations. Dr. Staats chose Carter instead of Irvin for the Supervisor -

Facility Maintenance I position, based on Davis and Dr. Prucnal's recommendation, on August 23, 2012.

Irvin's statutorily protected conduct for purposes of his retaliation claim is not his notification to Davis and Dr. Prucnal of his *disability*, which occurred in 2005. Rather, Irvin's statutorily protected conduct is notification to Davis and Dr. Prucnal of his *Requests for Accommodations*. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) ("The right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC.").

Davis and Dr. Prucnal, the decision makers, did not know about Irvin's requests until July 9, 2012 at the earliest. One month and 14 days elapsed between notice of the statutorily protected conduct and the adverse employment action. This six-to-seven week gap is sufficient to establish causation based on close temporal proximity. *See Farley*, 197 F. 3d at 1337.

Thus, Irvin has established a *prima facie* case of retaliation.

### 2.    Disability Discrimination *Prima Facie* Case

"Under this [*McDonnell Douglas*] burden-shifting analysis, [the plaintiff has] the initial burden of establishing a prima facie case of disability discrimination." *Cleveland*, 369 F.3d at 1193. "To establish a prima facie case of ADA discrimination, [the plaintiff has] to show (1) a disability, (2) that [he] was otherwise qualified to perform the job, and (3) that [he] was discriminated against based upon the disability." *Id*. Gadsden State argues that Irvin failed to establish the third element of his *prima facie* case because Irvin's notification to Gadsden State of his disability and the adverse employment action are too far apart in time. (Doc. 18, 24).

To establish the third element of his *prima facie* case, Irvin must establish that Gadsden

13

State failed to promote Irvin because of his disabilities. Under the ADA, an employer may not

"discriminate against a qualified individual on the basis of disability in regard to . . .

advancement." 42 U.S.C. § 12112(a). For purposes of Irvin's *prima facie* case, this element is

satisfied by showing that Gadsden State awarded the position to a similarly situated employee

who did not have a disability.[2] Gadsden State promoted Carter instead of Irvin. Carter does not

have a disability, but does have similar qualifications to Irvin. Thus, Irvin satisfies the third

element of his *prima facie* case of ADA discrimination.

Gadsden State argues that Irvin fails to establish the third element because "[t]his is not a

'close temporal proximity case.'" (Doc. 18, 24). However, close temporal proximity is not

required to prove causation on Irvin's *disability* claim. Instead, Irvin can rely on comparator

analysis to establish his *prima facie* case.

### 3.      Legitimate, Nondiscriminatory Reasons

"Once [the plaintiff] put[s] forth a prima facie case, which establishes a presumption of

discrimination, the burden then shift[s] to [the defendant] to articulate a legitimate,

non-discriminatory reason for [the adverse employment action]." *Cleveland*, 369 F.3d at 1193.

"[The defendant's] burden of rebuttal is exceedingly light. . . . At this stage of the inquiry, the

defendant need not persuade the court that its proffered reasons are legitimate; the defendant's

burden is merely one of production, not proof." *Gray v. City of Jacksonville, Fla.*, 492 Fed.

---

[2]Most Eleventh Circuit cases discuss the third element of an ADA disability discrimination claim in the context of an employer's failure to provide reasonable accommodations to an employee. *E.g. Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1263 (11th Cir. 2007). Here, however, Irvin does not allege that Gadsden State failed to provide accommodations. Instead, Irvin alleges that Davis and Dr. Prucnal chose Carter instead of Irvin for the Supervisor - Facility Maintenance I position *because of Irvin's disability*, separate from the reasonable accommodations provided to Irvin.

14

App'x 1, 7 (11th Cir. 2012). "The role of this Court is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments" and "[t]his court does not sit in judgment over whether the defendants made the right employment decision." *Id*. at 7-8.

Because Irvin has established *prima facie* cases of retaliation and disability discrimination, Gadsden State must proffer legitimate, non-discriminatory reasons for promoting Carter instead of Irvin. Gadsden State proffers multiple reasons that Davis and Dr. Prucnal recommended Irvin for the Supervisor - Facility Maintenance I position after Carter and Irvin's interviews.

First, Dr. Prucnal and Davis thought Carter had better qualifications than Irvin. Dr. Prucnal thought Carter's HVAC contractor's license and work as a journeyman sheet metal worker important because "it tells me that he's able to complete a series of or parts of education and then take exams and then do the work of a contractor which involves a lot of diagnostics, a lot of installations, a lot of design, recommendations, all of which he would face on the job. . . . I consider that very valuable." (Doc. 19-16, 30-31). Davis thought that Irvin answered two technical interview questions incorrectly that Carter correctly answered.

Second, Dr. Prucnal and Davis also thought Carter had better leadership qualities and communication skills. During Dr. Prucnal's interview, Carter "described projects in-depth. He described work experiences, what he had accomplished in-depth. He discussed team leadership." (Doc. 19-16, 29). In contrast, "Mr. Irvin's interview was short, in some cases one word answers, and did not – there was no elaboration on any question that was asked." (Doc. 19-16, 29). Davis thought Carter had "better leadership qualities" and "a better rapport with employees." (Doc. 19-

15

10, 28).

Third, Dr. Prucnal and Davis also thought Carter had a better range of experience. Carter served as a contact person in the maintenance department for the past ten years whenever Davis was out. Carter had also overseen major projects for Gadsden State, such as installation of a new boiler system that "saved probably six hundred thousand dollars." (Doc. 19-10, 13). While Irvin may have had similar experience, he did not mention it in his interview.

Gadsden State has proffered legitimate, non-discriminatory reasons for choosing Carter and not choosing Irvin.

### 4.    Pretext

"After the articulated reason [is] given, the inferential presumption of discrimination [is] eliminated, the *McDonnell Douglas* framework disappear[s], and [the plaintiff is] left with the ultimate burden of proving that [the defendant] intentionally discriminated against [the plaintiff] because of [the plaintiff's] disability." *Cleveland*, 369 F.3d at 1193. "[T]o prove this intentional discrimination, [the plaintiff is] allowed to show [the defendant's] reason [is] unworthy of credence and a pretext for discrimination." *Id.* (internal quotation marks omitted).

Irvin argues that Gadsden State's proffered reasons for choosing Carter and not choosing Irvin for the Supervisor - Facility Maintenance I position are pretext. None of his arguments are sufficient to establish pretext, however.

First, Irvin argues that Gadsden State's failure to follow its internal hiring policies when filling the Supervisor - Facility Maintenance I position indicates pretext.

"The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the

substantive reasons given by the employer for its employment decision were pretextual."
*Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F. 3d 1344, 1350 (11th Cir. 2007); *see*
*Mitchell v. USBI Co.*, 186 F.3d 1352, 1355-56 (11th Cir. 1999) ("Standing alone, deviation from
a company policy does not demonstrate discriminatory animus."). However, "[a]n employer's
violation of its own normal hiring procedure *may* be evidence of pretext . . . when an employer
disregards all but one of the factors and qualifications generally taken into consideration and
relies solely on a factor which is designed to create 'leeway' for the promotion of [certain]
people." *Adams v. Fulton County, Ga.*, 397 Fed. App'x 611, 613 (11th Cir. 2010) (emphasis
added).

Minor changes to internal procedures are generally not evidence of pretext. *See Keaton v.*
*Cobb County, Ga.*, No. 08-11220, 2009 WL 212097, at *5 (11th Cir. Jan. 30, 2009) (finding
"minimal" deviation from procedure is not evidence of pretext). Further, exercising discretion in
following internal hiring guidelines is not evidence of pretext. *See Walker v. Prudential Property*
*and Cas. Ins. Co.*, 286 F.3d 1270, 1273 (11th Cir. 2002) (finding discretionary choices by HR
personnel about whether to internally post a job opening is not evidence of pretext).

Even substantive changes to hiring procedures are generally not evidence of pretext. *See*
*Adams*, 397 Fed. App'x at 613 (finding adding a second round of interviews is not a sufficient
deviation from normal policy to show pretext when alteration did not create leeway to hire a
certain candidate); *see Conner v. Lafarge North America, Inc.*, 343 Fed. App'x 537, 542 (11th
Cir. 2009) (finding consideration of matrix factors in addition to interviews is not evidence of
pretext even if employer exclusively used interviews to fill positions in the past); *see Springer*,
509 F.3d at 1346, 1350 (finding failure to post a job position internally for three days and pre-

selecting candidate is not evidence of pretext); *but see Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (finding that deviation from normal policy, when employer sent separation notice six to twelve times later than normal, when coupled with other evidence, establishes pretext).

Irvin alleges that Gadsden State deviated from its internal hiring procedures by failing to follow the procedures in the *Uniform Guidelines*. Before hiring certain positions, the *Uniform Guidelines* require interviews by a search committee and Gadsden State's president. Here, instead, Gadsden State required the only two candidates to interview with Davis and Dr. Prucnal, who then recommended a candidate to Dr. Staats, who did not interview anyone.

However, as Gadsden State points out, the *Uniform Guidelines* do not apply to the Supervisor - Facility Maintenance I position because the position is a Schedule E position. The *Uniform Guidelines* are "a uniform procedure for the selection of faculty, administrative, and supervisory personnel on State Salary Schedules B, C, and D." (Doc. 19-16, 54). "The Chancellor [of the Alabama community college system] also requires *similar* process to fill positions on Salary Schedule E." (Doc. 19-16, 54 (emphasis added). In the past, Gadsden State has followed a procedure where Schedule E position candidates are interviewed by a search committee and then the supervisor. Here, Gadsden State followed a procedure where Schedule E position candidates were interviewed by two supervisors. The *Uniform Guidelines* do not require Gadsden State to follow any exact procedure for Schedule E positions.

Further, even if Gadsden State substantivally deviated from the *Uniform Guidelines*, those deviations are not evidence of pretext unless the deviations created "'leeway' for the promotion of [certain] people." *Adams*, 397 Fed. App'x at 613. For example, in *Adams*, the

Eleventh Circuit found that an employer's addition of a completely new step in the hiring process, a second round of interviews with the allegedly discriminatory supervisor, did not show pretext because the additional step did not cause the supervisor to "disregard[] any factors or qualifications" of the candidates. *Id.*

Here, Gadsden State made minor deviations from its hiring policy at most. Gadsden State did not add any additional steps to the hiring process and only changed the type of interviews it generally required. Even if this change to Gadsden State's hiring process was substantive, just like in *Adams* the change does not matter because no evidence suggests that changing the type of interviews caused Gadsden State to disregard any factors or qualifications in choosing Carter over Irvin.

Further, Gadsden State's process did not create leeway to hire Carter. Gadsden State used a formal hiring process. Gadsden State developed minimum qualifications for the position and collected application packets for two weeks. Cobb certified that only Irvin and Carter met the minimum requirements. Both Irvin and Carter interviewed with the same Gadsden State officials (Davis and Dr. Prucnal), interviewed for the same amount of time (15 minutes each), and answered the same questions. Davis and Dr. Prucnal immediately conferred and unanimously recommended Carter to Dr. Staats. No evidence exists that Gadsden State created leeway to choose Carter.

Irvin argues that putting Davis and Dr. Prucnal in charge of the interview process instead of a search committee tilts the playing field in Carter's favor because Davis and Dr. Prucnal tried to send Irvin home on April 16, 2012 and because Gadsden State recently accommodated Irvin. However, Davis and Dr. Prucnal did not send Irvin home on April 16, 2012 and, instead, Irvin

left work voluntarily to check on the status of his ADA accommodations. Further, whether Gadsden State recently accommodated Irvin's disability cannot be evidence that Davis and Dr. Prucnal harbored ill will toward Irvin because both fully cooperated with Irvin's accommodations.

In short, whether Gadsden State followed the *Uniform Guidelines* to the letter, or whether they are even mandatory, is irrelevant.

Second, in addition to Gadsden State's alleged deviation from internal guidelines, Irvin argues that Gadsden State has, over time, shifted its reasons for choosing Carter instead of Irvin. Gadsden State proffers multiple reasons it chose Carter over Irvin in its summary judgment brief. (Doc. 18, 26-29). However, the only reason Gadsden State gave in its EEOC response for choosing Carter was because "[b]ased on personal observation in the work environment, Mr. Carter was deemed to have better leadership abilities, and communication and organization skills." (Doc. 19-7, 5). Irvin argues that the additional reasons proffered by Gadsden State in its summary judgment brief are evidence of pretext.

"[A]n additional, but previously undisclosed, reason for an employment decision does not itself establish pretext." *Turner v. Georgia Sec'y of State*, 848 F. Supp. 2d 1361, 1376 (M.D. Ga. 2012) citing *Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998). Further, a later elaboration or "explanation of a general reason is insufficient to show pretext." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998). However, discrepancies and inconsistencies may establish pretext by casting doubt on the employer's credibility. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1058 (11th Cir. 2000).

Gadsden State has not shifted over time its rationale for choosing Carter. Although it only

included one sentence in its EEOC response highlighting Carter's superior leadership abilities, communication skills, and organization skills, the other reasons proffered in its summary judgment brief are not new or inconsistent. The multiple reasons in the summary judgment brief are both elaborations on the EEOC response and are other reasons from the notes Davis and Dr. Prucnal took directly after Irvin and Carter's interviews and from Davis and Dr. Prucnal's deposition testimony. These additional reasons proffered by Gadsden State do not show pretext.

As a third basis for pretext, Irvin argues that the interview process was unfair. Irvin suggests Dr. Prucnal did not give Irvin time to respond to questions during Irvin's interview with Dr. Prucnal. Irvin also suggests Carter may have known the answers to Davis's questions before the interview began.

"[P]oor interview performance [] can be as legitimate as any other reason." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001). "This is because traits such as common sense, good judgment, originality, ambition, loyalty, and tact often must be assessed primarily in a subjective fashion." *Id.* at 1106 (internal quotation marks omitted). In *Chapman*, the Eleventh Circuit found that an interviewer's conclusion that a candidate was not the best suited for the position was supported by a "reasonably specific factual basis," because the interviewer noted that the candidate provided inarticulate answers and was unable to communicate his answers concisely as the job would require. 229 F.3d at 1034-35.

Here, Carter and Irvin each had 15 minutes to convince Davis and Dr. Prucnal that they were the best candidate. Irvin complains that Dr. Prucnal instructed Irvin to keep his answers brief and did not ask Irvin follow up questions about his experiences. However, Carter and Irvin received the same amount of time to interview and no evidence exists that Dr. Prucnal or Davis

followed a different procedure when interviewing Carter. Carter took advantage of his time while Irvin did not.

Further, Irvin's suggestion that Davis may have given Carter the answers to the questions Irvin answered incorrectly because Irvin saw Davis and Carter together before the interview is not supported by evidence. Davis and Carter work together daily and just because Irvin saw Davis and Carter together before their interview, even in the light most favorable to Irvin, proves nothing. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (finding non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."). No evidence indicates that Davis stacked the deck against Irvin by supplying Carter with answers before the interview.

Fourth, Irvin argues that Gadsden State's reasons are pretext because he had better qualifications than Carter. Irvin held a formal maintenance supervisor position previously while Carter had only been an informal "lead man" or point of communication for Davis in the maintenance department. Further, Irvin received excellent performance reviews.

"In the context of a promotion '[a] plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted.'" *Springer*, 509 F.3d at 1349. "[A] plaintiff must show that the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Id*. "It is not the Court's place to question the wisdom of the panel members who scored an applicant with less experience higher than an applicant with more experience." *Robinson v. Orange County, Fla.*, No. 6:05-CV-717-ORL-31DAB, 2006 WL

1678967, at *31 n.33 (M.D. Fla. June 16, 2008).

Here, Irvin's qualifications are not overwhelmingly better than Carter's qualifications such that no reasonable person would have chosen Carter. Whether Irvin had more formal supervisory experience than Carter is irrelevant when Carter interviewed better than Irvin and when Carter had other credentials that Dr. Prucnal and Davis considered valuable, such as Carter's HVAC certification.

**D.    Summary**

In summary, Irvin has shown a *prima facie* case of retaliation and disability discrimination. However, Irvin fails to show that Gadsden State's legitimate, non-discriminatory reasons for choosing Carter instead of him are pretext for discrimination. Thus, the court will grant Gadsden State's motion for summary judgment.

**II.    Motion to Strike**

Irvin asks the court to strike one footnote of Gadsden State's brief and related evidentiary material. According to Irvin, Gadsden State cites inadmissible hearsay related to instructions Cobb received about the procedures to use to fill the Supervisor - Facility Maintenance I position and whether the procedure Gadsden State used to fill the position was correct under the *Uniform Guidelines*.

Whether to grant a motion to strike is an evidentiary ruling within the court's discretion. *See United States v. Stout*, 667 F.2d 1347, 1353 (11th Cir. 1982) ("A trial court's ruling as to the materiality, relevancy or competency of testimony or exhibits will ordinarily not warrant reversal unless constituting an abuse of discretion." (internal citations omitted)).

Here, determination of Irvin's motion to strike is unnecessary because, as discussed

23

above, deviation from the *Uniform Guidelines* is not evidence of pretext. *Springer*, 509 F.3d at 1350. Further, the court does not rely on any of the evidence Irvin asks the court to strike and, thus, the court need not consider this motion in determining whether to grant summary judgment to Gadsden State. Put another way, it does not matter how the court rules on this motion. The result is the same. Thus, the court will deny as moot Irvin's motion to strike.

**III.     Conclusion**

For the reasons explained above, the court **GRANTS** summary judgment for Gadsden State. Further, the court **DENIES AS MOOT** Irvin's motion to strike as resolution of the motion to strike is irrelevant to the court's determination.

**DONE** and **ORDERED** this 24th day of April, 2015.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE